158 P.3d 1152 (2007)
STATE of Washington, Respondent,
v.
Nicholas Daniel HACHENEY, Petitioner.
No. 77767-5.
Supreme Court of Washington, En Banc.
Argued October 24, 2006.
Decided May 31, 2007.
*1154 John L. Cross, Cross & LaCross PLLC, Port Orchard, WA, for Petitioner.
Randall Avery Sutton, Kitsap Co Prosecutor's Office, Port Orchard, WA, for Respondent.
Jeffrey Erwin Ellis, Ellis Holmes & Witchley PLLC, Seattle, WA, for Amicus Curiae Wash. Ass'n of Criminal Defense Lawyers.
BRIDGE, J.
¶ 1 Dawn Hacheney's body was found badly burned after a fire destroyed part of the Hacheney home. The State eventually charged her husband, Nicholas Hacheney, with her murder. At trial, the State's experts presented evidence that Dawn was suffocated to death before the fire began. The jury found Nicholas Hacheney guilty of premeditated first degree murder. By special verdict, the jury also found that he committed the murder "in the course of" first degree arson, an aggravating factor subjecting him to a life sentence without the possibility of release. Clerk's Papers (CP) at 1362; RCW 10.95.020(11)(e). Hacheney now argues that the jury was improperly instructed on the aggravating factor and that there was insufficient evidence to show that he committed the murder in the course of arson because Dawn was dead before the fire was set. This court has held that in order for a death to have occurred in the course of a felony, there must be a causal connection such that the death was a probable consequence of that felony. State v. Golladay, 78 Wash.2d 121, 131, 470 P.2d 191 (1970), overruled on other grounds by State v. Arndt, 87 Wash.2d 374, 378, 553 P.2d 1328 (1976); State v. Diebold, 152 Wash. 68, 72, 277 P. 394 (1929). In this case, the murder was not a probable consequence of the arson. We conclude that, as a matter of law, Hacheney did not murder his wife in the course of arson.
¶ 2 Hacheney also argues that the trial judge violated his Sixth Amendment right to confrontation by allowing the jury to view videotaped depositions of three witnesses who were out of the country at the time of trial. We conclude that Hacheney did not suffer a confrontation clause violation because those witnesses were unavailable for confrontation clause purposes. We affirm in part, reverse in part, and remand for resentencing absent the aggravating factor.

I

Facts and Procedural History
¶ 3 Nicholas Hacheney was one of several pastors at a large church in Bremerton, Washington. On December 25, 1997, Nicholas and Dawn Hacheney attended a Christmas party, and they returned home late in the evening. Dawn's mother reported that Dawn had not been feeling well that day and she was taking Benadryl.
¶ 4 Early the next morning, Nicholas Hacheney left to meet friends for a hunting trip. Soon after, the Hacheneys' neighbors noticed that a fire had erupted in the Hacheney home. Firefighters responded and put out the blaze, which had destroyed the bedroom. The firefighters discovered Dawn's badly burned body on the bed. They also discovered several propane canisters and an electric space heater in the bedroom.
¶ 5 When interviewed by investigators, Nicholas Hacheney reported that he and his wife had opened Christmas presents late on Christmas night, and they had left wrapping paper in front of the heater. He said that he had turned the space heater on before he left that morning. He reported that Dawn had gotten up in the middle of the night to take Benadryl and suggested that her sensitivity to the drug might have explained her failure to escape the fire. He also explained that the case of propane had been a Christmas present that he opened the night before, and he had not yet removed it from the bedroom.
¶ 6 The autopsy, completed by a forensic pathologist, revealed that Dawn did not have soot in her trachea or lungs. Tests submitted to the state toxicology lab and other labs *1155 revealed that Dawn had no carbon monoxide or cyanide in her blood, all of which suggested that she did not inhale after the fire began. She did have an elevated level of Benadryl in her blood. The autopsy report stated that Dawn suffered from pulmonary edema or fluid in her lungs, which can occur as a result of asphyxiation, suffocation, or a long list of other causes. The forensic pathologist concluded that Dawn was asphyxiated when her larynx reflexively closed as the result of a flash fire. The pathologist based his flash fire conclusion in part on the fact that there was no suspicion of foul play at the time. The original police and insurance investigations concluded that the fire and Dawn's death were accidental, though at least one investigator reported being uncomfortable with that conclusion.
¶ 7 Then in 2001, several facts came to light that caused authorities to take a second look. Sandra Glass approached investigators and reported that she had an affair with Nicholas Hacheney during the summer and fall of 1997. A couple of weeks after Dawn's death, Hacheney confessed to Glass that on Christmas night he had given Dawn some Benadryl and then lain awake until God told him to "`Take the land,'" a biblical phrase interpreted by members of his church to be an admonition to act. Report of Proceedings (RP) at 2333-34. Glass told authorities that Hacheney confessed to having held a plastic bag over Dawn's head until she stopped breathing; he then set the fire. Hacheney also told Glass that Dawn knew what was happening to her.[1] Further investigation revealed that in the few months after Dawn's death, Nicholas Hacheney developed ongoing sexual relationships with at least three additional church members.
¶ 8 In September 2001, the Kitsap County prosecutor charged Nicholas Hacheney with first degree premeditated murder and/or first degree felony murder committed in the course of, in furtherance of, or in flight from first degree arson. The prosecutor then filed an amended information elevating the premeditated murder charge to aggravated first degree murder based on two alternative aggravating circumstances. The State alleged that Hacheney committed the murder to conceal the commission of a crime and/or he committed the murder in the course of, in furtherance of, or in immediate flight from arson in the first degree.
¶ 9 Hacheney challenged whether there was probable cause to support the amended charges. The trial court agreed that there was not probable cause to charge him with felony murder, with committing the murder to conceal a crime, or with committing the murder "in furtherance of" or "in immediate flight from" arson. However, the court concluded that there was probable cause to charge Hacheney with aggravated premeditated first degree murder committed "in the course" of first degree arson. CP at 349; CP at 919 (Third Amended Information).
¶ 10 Before trial, it became apparent that three witnesses were going to be out of the country at the time of trial. Two were parishioners at Hacheney's church and the third was an electrical engineer who had consulted with Safeco Insurance as a fire investigator. All three witnesses were subpoenaed and all three notified prosecutors that they would be out of the country and unable to return for trial. All three were deposed and videotapes of their deposition testimony were shown at trial over defense objection. The videotaped depositions were redacted to delete deposition objections and testimony that had been ruled inadmissible.
¶ 11 After a lengthy trial involving several expert witnesses, the jury was instructed that it had to first determine whether Hacheney was guilty of first degree premeditated murder. If the jury found Hacheney guilty, it then had to consider the aggravating circumstance, whether the murder was committed "in the course of" arson in the first degree. CP at 1352. At the State's request and over the defendant's objection, the jury was further instructed:

*1156 To establish that the killing occurred "in the course of" another crime, there must be an intimate connection between the killing and the other crime. The killing and the other crime must be in close proximity in terms of time and distance. However, more than a mere coincidence of time and place is necessary: A causal connection must clearly be established between the two crimes.
CP at 1353.[2] During deliberations, the jury submitted the following question:
Would arson be an aggravating circumstance if Dawn Hacheney was [already] dead but other people were injured by the fire. For instance the insurance company, Dawn's parents and Dawn's body.
CP at 1358. The court responded, "[t]he court will not provide further instructions in response to this inquiry. Please review the instructions provided." CP at 1358. The jury also inquired:
For arson to be an aggravating circumstance did the fire have to result in the injury to a living person or only related to the murder, assuming Dawn Hacheney was [already] dead.
CP at 1360. The court responded identically to this question.
¶ 12 On December 26, 2002, the jury found Nicholas Hacheney guilty of first degree premeditated murder. By special verdict, it also found that he committed the murder in the course of arson in the first degree. Having been convicted of aggravated first degree murder, Hacheney was sentenced to life in prison without the possibility of release.
¶ 13 Hacheney appealed, raising numerous issues. State v. Hacheney, 2005 WL 1847160, at *1, 2005 Wash.App. LEXIS 1940, at *1. He argued, in part, that the evidence was insufficient to support the jury's finding that he committed murder "`in the course of'" first degree arson. Id. at *3, 2005 Wash. App. LEXIS 1940, at *8. In an unpublished opinion, the Court of Appeals held that the murder was sufficiently connected to the arson to be part of the res gestae[3] of the crime, and thus, the evidence was sufficient to show that Dawn's murder was committed in the course of arson. Id. at *4, 2005 Wash. App. LEXIS, at *11 (citing State v. Brown, 132 Wash.2d 529, 610, 940 P.2d 546 (1997), death sentence rev'd on other grounds, Brown v. Lambert, 451 F.3d 946 (9th Cir. 2006)). The Court of Appeals also concluded that the jury instruction on the aggravating factor was not improper. Id. at *4, 2005 Wash.App. LEXIS, *12.
¶ 14 In addition, Hacheney argued that the trial court violated his Sixth Amendment right to confrontation when it admitted the three witnesses' videotaped depositions in lieu of their live testimony. Id. at *5, 2005 Wash.App. LEXIS, at *17-18. The Court of Appeals concluded that the State had made a good faith effort to procure the witnesses' attendance sufficient to satisfy the Sixth Amendment. Id. at *6, 2005 Wash.App. LEXIS, at *23.
¶ 15 Hacheney petitioned for review in this court. We granted review only "as to the issue of arson as an aggravating factor and the issue of whether the admission of depositions violated the defendant's right of confrontation." Wash. State Supreme Court Order, State v. Hacheney, noted at 157 Wash.2d 1008, 139 P.3d 349 (July 6, 2006).

II

Analysis

Sufficiency of the Evidence/Jury Instruction
¶ 16 RCW 10.95.020 provides that a person is guilty of aggravated first degree murder if he or she commits premeditated first degree murder and the jury finds one of a statutory list of aggravating circumstances. Aggravating circumstances can be found where the person committed the premeditated murder to conceal the commission of a crime or where the murder was committed "in the course of, in furtherance of, or in immediate flight from" robbery, rape, or burglary *1157 in the first or second degree, residential burglary, kidnapping in the first degree, or arson in the first degree. RCW 10.95.020(9), (11). A verdict of aggravated first degree murder can subject the defendant to the death penalty, but where the prosecutor has chosen not to seek the death penalty, the sentence must be life without the possibility of release. RCW 10.95.030(1).
¶ 17 The trial court in this case found that the evidence presented in the certification for probable cause could support a factual finding that Dawn Hacheney "was dead before her body was burned by a fire started in the bedroom." CP at 349 (emphasis added). As a result, the trial court concluded that there was not probable cause for the prosecution to proceed on a charge of aggravated first degree murder "`in furtherance of'" or "`in immediate flight from'" first degree arson. CP at 350. The trial court also concluded that there was not probable cause for the prosecution to proceed on a charge of aggravated first degree murder to conceal another crime because the State's theory was that Hacheney committed the arson to conceal the murder, not that he committed the murder to conceal the arson. Id.; cf. State v. Bartholomew, 98 Wash.2d 173, 213, 654 P.2d 1170 (1982) (finding murder was committed to conceal robbery for long enough to allow defendant to escape), vacated on other grounds, Washington v. Bartholomew, 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983). However, the trial court concluded that there was probable cause to support the charge that Hacheney committed the murder "`in the course of'" arson in the first degree. CP at 349. Hacheney now argues that the murder could not have occurred "in the course of" the arson because, according to the State's evidence, the murder was complete before the arson began and the murder did not further the arson.
¶ 18 The State correctly explains that where a defendant challenges the sufficiency of the evidence supporting his conviction, we must consider the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the presence of the aggravating factor beyond a reasonable doubt. See State v. Brown, 132 Wash.2d 529, 607, 940 P.2d 546 (1997). However, Hacheney's argument also depends upon how broadly we interpret the statutory language "in the course of . . . [a]rson in the first degree." RCW 10.95.020(11)(e). Statutory interpretation is a question of law subject to de novo review. E.g., Cerrillo v. Esparza, 158 Wash.2d 194, 199, 142 P.3d 155 (2006).
¶ 19 Both the trial court and the Court of Appeals relied primarily on Brown, 132 Wash.2d at 607-11, 940 P.2d 546, to conclude that there was a sufficiently intimate connection between the arson and the murder in this case for the murder to have occurred "in the course of" the arson. CP at 349; Hacheney, 2005 WL 1847160 at *3, 2005 Wash.App. LEXIS 1940, at *10-11. In Brown, the defendant kidnapped his victim because he needed money to make a trip to California. Brown, 132 Wash.2d at 610, 940 P.2d 546. Brown robbed his victim, and then held her for two days, during which he raped, tortured, and eventually killed her. Id. Brown argued that because the murder occurred hours after the other felonies were committed or completed, these facts did not provide sufficient evidence to prove that he killed his victim in the course of or in furtherance of robbery, rape, or kidnapping. Id. at 609, 940 P.2d 546.[4]
¶ 20 The Brown court explained that to establish that a killing occurred in the course of, in furtherance of, or in the immediate flight from a felony
there must be an intimate connection between the killing and the felony. The killing must be part of the res gestae of the felony, that is, in close proximity in terms of time and distance. A causal connection must clearly be established between the two. In other words, more than a mere coincidence of time and place is necessary.
Id. at 608, 940 P.2d 546 (internal quotations and footnotes omitted). The Brown court later explained that

*1158 We have also recognized the need for a "causal" or "intimate" connection between a killing and a related felony to establish the killing was committed in the course of, in furtherance of, or in immediate flight from the felony.
Id. at 610, 940 P.2d 546. The Court of Appeals in this case seems to have inferred from the Brown court's use of the words "`causal' or `intimate' connection" that the felony need not cause the killing, so long as there is a sufficiently intimate connection between the killing and the felony that they are part of the same res gestae. See Hacheney, 2005 WL 1847160 at *3, 2005 Wash.App. LEXIS 1940, at *11. However, the Court of Appeals' reliance on the word "or" is questionable, given the Brown court's earlier explanation that a causal connection must clearly be established. Brown, 132 Wash.2d at 608, 940 P.2d 546.
¶ 21 When discussing the necessary causal connection, the Brown court relied on Golladay, 78 Wash.2d 121, 470 P.2d 191. Brown, 132 Wash.2d at 608, 940 P.2d 546. Golladay allegedly killed the victim, a female hitchhiker, and then drove away from the scene. Golladay, 78 Wash.2d at 123-24, 470 P.2d 191. A short time later, he ran his car into an embankment. Id. at 124, 470 P.2d 191. After the accident, the defendant disposed of the victim's purse and shoes in a nearby field in an attempt to conceal the fact that the victim had been in his car. Id. at 125, 470 P.2d 191. The State charged Golladay with first degree felony murder, citing larceny of the purse and shoes as the predicate crime. Id. at 128-29, 470 P.2d 191.
¶ 22 The Golladay court concluded that there was not a sufficient causal connection between the murder and the larceny, pointing to the fact that the larceny occurred after the killing. Id. at 130, 470 P.2d 191. The court explained:
"As to when a homicide may be said to have been committed in the course of the perpetration of another crime, the rule is . . . :
`It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestae of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act.'"
Id. at 131, 470 P.2d 191 (emphasis added) (quoting State v. Diebold, 152 Wash. 68, 72, 277 P. 394 (1929) (quoting 13 RULING CASE LAW 845));[5]see also State v. Dudrey, 30 Wash.App. 447, 450, 635 P.2d 750 (1981) (holding the State must prove that at the time of the homicide the defendant was engaged in the commission of the felony). The Golladay court reasoned that for a homicide to have been committed in the course of a felony, the causal connection had to run such that the death was the probable consequence of the felony, but not the other way around. See id.; cf. State v. Leech, 114 Wash.2d 700, 705, 709, 790 P.2d 160 (1990) (holding where the defendant's conduct in setting a fire was a proximate cause of a firefighter's death, the death occurred in course of and in furtherance of the arson).
¶ 23 The trial court here attempted to distinguish this case from Golladay because Golladay was a felony murder case, not an aggravated murder case. Arguably, the purpose *1159 of the felony murder statute is to establish that once a person decides to commit an enumerated felony, he or she is responsible for all of the fatal consequences, intended or not. E.g., Leech, 114 Wash.2d at 708, 790 P.2d 160. In contrast, the aggravated first degree murder statute punishes premeditated murder that is also committed in the course of an enumerated felony. RCW 10.95.020(11). In this sense, the two are different. But in both circumstances the defendant's culpability for the killing is enhanced because the killing occurred "in the course of" an enumerated felony. RCW 10.95.020(11); RCW 9A.32.030(1)(c). For purposes of the current analysis, this court has not distinguished between the two. See Brown, 132 Wash.2d at 608-09, 940 P.2d 546 (relying on felony murder cases in an aggravated murder case). Thus, consideration of both Brown and Golladay is appropriate here.
¶ 24 It is true that in several pre-Golladay cases, this court reasoned that where there was sufficient connection between the murder and the felony, the fact finder did not have to pinpoint the exact time of death, so long as the killing was part of the res gestae of the felony. See State v. Anderson, 10 Wash.2d 167, 178, 116 P.2d 346 (1941) (quoting State v. Whitfield, 129 Wash. 134, 138-39, 224 P. 559 (1924)). In Anderson, the defendant had been trying to steal the victim's eggs when the victim discovered the defendant, prompting the defendant to shoot the victim. Id. at 170, 116 P.2d 346. In Whitfield, it was impossible to tell whether the child victim died from blows inflicted by the defendant before or after he committed rape. Anderson, 10 Wash.2d at 177-78, 116 P.2d 346 (discussing Whitfield, 129 Wash. 134, 224 P. 559); see also State v. White, 60 Wash.2d 551, 558-59, 563, 374 P.2d 942 (1962) (defendant inflicted severe head injuries upon a woman, walked away for a moment, and then returned to rape her). Similarly, in State v. Craig, 82 Wash.2d 777, 514 P.2d 151 (1973), a post-Golladay case, the defendants killed a cab driver and then took the victim's wallet and car. But they claimed that they had killed in a drug induced rage and did not develop an intent to rob until after the killing was complete. Id. at 779, 514 P.2d 151. This court recognized that the killing was done in connection with a robbery as part of "`the same transaction.'" Id. at 782-83, 514 P.2d 151 (quoting State v. Coe, 34 Wash.2d 336, 341, 208 P.2d 863 (1949)). It was not incumbent on the State to prove that the defendant intended robbery when he committed the murder. Id. at 782, 514 P.2d 151; see also State v. Temple, 5 Wash.App. 1, 6-7, 485 P.2d 93 (1971) (death immediately preceded theft of victim's shoes, watch, and wallet). While some language in these cases suggests a broader rule than was articulated in Golladay, they are all distinguishable in that the deaths clearly occurred either during, in the furtherance of, or in flight from the commission of the underlying felonies. In contrast, in both Golladay and in this case, the evidence showed the felonies were committed to cover up or facilitate escape from already completed murders.
¶ 25 Even so, in cases similar to this one, other states have opted for a broader reading of their aggravated first degree murder statutes. For example, in People v. Thomas, 137 Ill.2d 500, 561 N.E.2d 57, 148 Ill.Dec. 751 (1990), the victim caught the defendant trying to steal items from her garage. Id. 148 Ill.Dec. 751, 561 N.E.2d at 61. There was a struggle and the defendant stabbed the victim, killing her. Id. He then set the garage on fire in order to conceal the murder. Id. The jury found the defendant guilty and then found that he was eligible for the death penalty because he committed murder in the course of arson or burglary. Id. 148 Ill.Dec. 751, 561 N.E.2d at 61, 70. Thomas argued that he could not have committed the murder in the course of arson because the victim was dead when he started the fire. Id. 148 Ill.Dec. 751, 561 N.E.2d at 70. The Thomas court held that a murder occurs in the course of another felony where the murder and the accompanying felonies were part of the "same criminal episode." Id. 148 Ill.Dec. 751, 561 N.E.2d at 71. The court distinguished contrary holdings from other states by noting that the Illinois statute's "`in the course of'" language should be interpreted more broadly than "`during the commission or attempted commission of'" language:

*1160 we think that the Illinois statute recognizes that the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues throughout the time that the perpetrator conceals the crime and flees the scene.
Id.; see also Ex parte Roberts, 735 So.2d 1270, 1278 (Ala.1999) (finding it sufficient that arson and murder were part of continuous chain of events); Way v. State, 496 So.2d 126, 128 (Fla.1986) (holding prosecution need not prove victims were killed by fire, so long as deaths occurred during same criminal episode as arson).
¶ 26 However, the California Supreme Court reasoned differently in People v. Green, 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468, 505 (1980), overruled on other grounds by People v. Dominguez, 39 Cal.4th 1141, 47 Cal.Rptr.3d 575, 140 P.3d 866 (2006). In Green, the defendant shot his wife in the face and then took her clothing, her jewelry, and her purse for the purpose of concealing her identity. Id. 164 Cal.Rptr. 1, 609 P.2d at 475-76, 500. The court concluded that the robbery did not occur during the commission of the murder, explaining that the aggravated first degree murder statute was intended to narrow the defendants eligible for the death penalty. Id. 164 Cal.Rptr. 1, 609 P.2d at 505. The court reasoned that when the legislature characterized murders committed "`during the commission'" of an enumerated felony as aggravated, it intended to allow the death penalty for those "who killed in cold blood in order to advance an independent felonious purpose, e.g., who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnapping, or a rape." Id. 164 Cal.Rptr. 1, 609 P.2d at 505. Thus, where murder was the primary crime and the felony was incidental because it was intended only to conceal the murder, imposition of aggravating circumstances was inappropriate. Id. 164 Cal.Rptr. 1, 609 P.2d at 505-06.
¶ 27 Here, we must decide whether to continue to apply the rule articulated in Golladay and Green or instead adopt a broader rule like that set forth by the Illinois Supreme Court in Thomas. We believe the Golladay articulation of the connection necessary to establish that a murder occurred "in the course of" a felony is supported by the plain language of the aggravated first degree murder statute. The "course" of something is its "ordered continuing process, succession, sequence, or series." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 522 (2002); State v. Watson, 146 Wash.2d 947, 954-56, 51 P.3d 66 (2002) (looking to dictionary definition where term not defined by statute). A person is guilty of aggravated first degree murder if the murder was committed "in the course of" an enumerated felony, RCW 10.95.020(11), not if the enumerated felony is committed in the course of the murder. The legislature adopted the "in the course of" language after this court had, in Golladay, defined "in the course of" as requiring a causal connection such that the death was a probable consequence of the felony. Golladay, 78 Wash.2d at 131, 470 P.2d 191; LAWS of 1981, ch. 138, § 2(9). Moreover, for a killing to have occurred "in the course of" arson, logic dictates that the arson must have begun before the killing.[6]
¶ 28 Even if we were to conclude that the term "in the course of" is ambiguous, the rule of lenity dictates that we construe aggravating circumstances narrowly, especially where their application determines the imposition of our most severe penalties, death or life without possibility of release. See In re Pers. Restraint of Cruz, 157 Wash.2d 83, 88, 134 P.3d 1166 (2006). Aggravated circumstances are used, theoretically, to select from the larger set of first degree murders those deserving of our most severe penalties. Dana K. Cole, Expanding Felony-Murder in Ohio: Felony-Murder or Murder-Felony?, 63 Ohio St. L.J. 15, 23 *1161 (2002). While arson to conceal an already completed murder is reprehensible, it does not necessarily have the same impact upon the severity of the actual murder as the other statutory aggravators. Cf. RCW 10.95.020(1)-(14) (listing various characteristics of the victim, the defendant, or the nature of the killing itself that the legislature deemed particularly deserving of the death penalty or mandatory life imprisonment). Concealment of a murder, even by partial or total destruction of the body, is not an aggravating circumstance under our statute. Id.
¶ 29 In addition, there were other appropriate ways for the prosecutor to seek punishment for both the murder and the arson. The State could have charged the felony independent of the murder, potentially increasing the offender score for the murder. See RCW 9.94A.589(1); .525(1). In addition, the State could have attempted to procure a sentence enhancement or consecutive sentences based on the arson. See RCW 9.94A.535(3); .589; e.g., Medina v. Artuz, 872 F.Supp. 1258, 1260-61 (S.D.N.Y.1995) (upholding consecutive sentences based on the fact that arson was committed to conceal murder). Our resolution of this case does not suggest that a felony committed to conceal murder should go unpunished.
¶ 30 In sum, this court in Golladay insisted that for a death to have occurred in the course of an enumerated felony there must be a causal connection between the two such that the death must have been a probable consequence of the felony, not the other way around. Golladay, 78 Wash.2d at 131, 470 P.2d 191. In Brown, we did not disapprove this test. See Brown, 132 Wash.2d at 608, 940 P.2d 546 (citing Golladay, 78 Wash.2d at 130, 470 P.2d 191). The plain language of the aggravated first degree murder statute does not provide that the aggravating circumstance applies if the felony occurred in the course of the murder. Even if we were to find the term "in the course of" to be ambiguous, the rule of lenity dictates narrow construction of aggravating circumstances. We conclude that, as a matter of law, the evidence does not support a charge that Hacheney killed Dawn in the course of the arson. We reverse the Court of Appeals, vacate the aggravating circumstance, and remand to the trial court for resentencing. Because the facts, as a matter of law, do not support an aggravating circumstance, there is no need to address the jury instruction challenge.

Deposition Testimony
¶ 31 The sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[7] Pursuant to the Sixth Amendment, a prosecutor must show that a witness is unavailable to testify before he or she can resort to presenting the witness's prior testimony. See, e.g., Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In this case, Hacheney contends that the State did not establish the unavailability of three witnesses sufficiently to support admission of their videotaped depositions at trial.
¶ 32 Prior to trial it became clear that three of the State's witnesses would be out of the country at the time of trial, despite the fact that all three were under subpoena. CP at 617-19; RP at 3829-30. Two witnesses, a husband and wife, planned to move to Scotland in early September 2002 so that the husband could begin a graduate program there. CP at 618. They did not plan to return to the United States for at least three years. CP at 912. A third witness, an electrical engineer, planned to be in a remote area of Bolivia for six to nine months to assist in construction of a radio network. CP at 619, 1022. The project involved complex scheduling with a construction team. CP at 619.
¶ 33 The State moved to conduct videotaped perpetuation depositions of these witnesses. CP at 617. In part, the State argued that it would be burdensome for the witnesses and financially burdensome for the State to bring these witnesses back for trial. *1162 CP at 617-18. The trial judge granted the motions, and videotaped depositions were taken. CP at 623, 630, 633. Hacheney was present at each deposition and his attorney cross-examined each witness with the knowledge that the witnesses would be out of the country when the trial occurred. CP at 1018, 1089, 1199, 1264.
¶ 34 At the time of trial, the State submitted letters from all three witnesses confirming that they were indeed out of the country. CP at 912-13. The State sought to show the video depositions in lieu of their live testimony. The defense objected, arguing that the State had not taken adequate steps to show that the witnesses were truly unavailable and the State had done nothing to secure the witnesses' presence at trial. CP at 999-1002. The trial court ruled that the videotaped depositions would be shown to the jury but that they would be redacted to exclude objections and testimony that the court had ruled inadmissible. CP at 1007-13.
¶ 35 A witness's absence from the jurisdiction, without more, is not enough to satisfy the confrontation clause's unavailability requirement. Barber v. Page, 390 U.S. 719, 723, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). "[A] witness is not `unavailable' . . . unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Id. at 724-25, 88 S.Ct. 1318. The length to which the prosecution must go to procure a witness's presence is a question of reasonableness. Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), overruled on other grounds by Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. The question of unavailability is "one of fact to be determined by the trial judge," State v. Allen, 94 Wash.2d 860, 866, 621 P.2d 143 (1980). Because the trial court is in the best position to evaluate witness unavailability, we do not easily overturn a trial court's factual unavailability determination. State v. DeSantiago, 149 Wash.2d 402, 411, 68 P.3d 1065 (2003) (reviewing unavailability determination for abuse of discretion).[8]
¶ 36 In this case, all three witnesses were subpoenaed and they made themselves available until they had to leave the country. There is nothing in the record to suggest that the prosecutor indicated to any witness that he or she need not appear to testify in person. Hacheney, 2005 WL 1847160 at *6, 2005 Wash.App. LEXIS 1940, at *23. No witness was released from his or her subpoena. Two witnesses stated in their letter to the court that they would not be leaving Scotland anytime during the remainder of 2002. CP at 912. Similarly, the third explained that his work in Bolivia involved complex scheduling with a construction team, so his trip could not be rescheduled. CP at 619. The trial court could have legitimately concluded that it would have been a hardship for any of the three to return to Washington to testify at trial. Hacheney argues that the State should have had to show that it offered to pay travel expenses for the witnesses to return, but as the Court of Appeals explained, the trial court could have reasonably inferred from the record that even then, the witnesses would have remained in Scotland and Bolivia. Hacheney, 2005 WL 1847160 at *6, 2005 Wash.App. LEXIS 1940, at *22.
¶ 37 Hacheney was present at the depositions, and because they were videotaped, the jury was able to observe each witness's demeanor. See State v. Hewett, 86 Wash.2d 487, 492-93, 545 P.2d 1201 (1976). Hacheney's attorneys were aware at the time of the depositions that the witnesses would be out of the country at the time of trial. See State v. Hobson, 61 Wash.App. 330, 335, 810 P.2d 70 (1991). This trial lasted almost two months and the State presented numerous witnesses, including several experts. A second fire investigator was able to testify about the joint examination of the possible electrical causes of the fire. RP at 3482. The two parishioners of Hacheney's church spoke to Hacheney's proclivity for extramarital sex, but this fact was also established by other witnesses, including the church women with *1163 whom he had sexual relationships. RP at 606, 642, 2897-98, 3734. Hacheney's conviction did not rest entirely on the testimony of any of the three deposed witnesses. Cf. State v. Rivera, 51 Wash.App. 556, 559-60, 754 P.2d 701 (1988). In light of the hardship involved and the testimony supplied by other witnesses, it was reasonable for the trial court to admit the videotaped depositions.
¶ 38 Hacheney relies primarily on State v. Aaron, 49 Wash.App. 735, 745 P.2d 1316 (1987), a case discussing unavailability under ER 804, where the Court of Appeals reversed a burglary conviction because the State's primary witness was teaching in England at the time of trial. But in that case, the witness was not subpoenaed, there was no evidence in the record as to whether she had ever been asked to return voluntarily for trial, and the absent witness was crucial. Id. at 743, 745 P.2d 1316. The Aaron court emphasized that the State made "no effort" to procure the witness's testimony at trial. Id. at 745, 745 P.2d 1316. Aaron is easily distinguishable and does not undermine the unavailability finding in this case.[9] We conclude that the trial court reasonably found that all three witnesses were unavailable at the time of trial. We find no violation of Hacheney's confrontation clause rights.

III

Conclusion
¶ 39 While other states have interpreted their aggravated first degree murder statutes more broadly, this court has held that for a murder to have occurred "in the course of" a felony, the murder must have been a probable consequence of the felony. Golladay, 78 Wash.2d at 131, 470 P.2d 191; Diebold, 152 Wash. at 72, 277 P. 394. The Golladay reading of the "in the course of" language remains true to the plain meaning of the statutory language, and it does not create an unwarranted expansion of the set of cases eligible for the death penalty or life without the possibility of release. We conclude that, while he may have committed arson in the course of covering up a murder, as a matter of law, Hacheney did not murder his wife in the course of arson. We also conclude that Hacheney did not suffer a confrontation clause violation because the witnesses whose videotaped depositions were admitted at trial were indeed unavailable. We affirm in part, reverse in part, and remand for resentencing without consideration of the improper aggravating circumstance.
WE CONCUR: GERRY L. ALEXANDER, Chief Justice, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST and RICHARD B. SANDERS, Justices.
J.M. JOHNSON (concurring in part and dissenting in part).
¶ 40 I have previously expressed my dismay at the failure of a majority of this court to recognize the sanctity of a jury verdict in our system. See State v. Gregory, 158 Wash.2d 759, 886-903, 147 P.3d 1201 (2006) (J.M. Johnson, J., dissenting). The majority's decision in the present case inspires a like lament. As in Gregory, the majority here overturns a validly rendered jury verdict without legal justification and without adequate regard for Dawn Hacheney, the victim of this heinous crime. Accordingly, I dissent in large part from the majority's decision.[1]
¶ 41 Washington's "aggravated murder" statute imposes special sanctions for some murders, including those committed in the course of certain felonies. See RCW 10.95.020(11). The majority interprets RCW 10.95.020(11)'s "in the course of" language as follows: "[I]n order for a death to have occurred in the course of a felony, there must be a causal connection such that the death was a probable consequence of that felony." *1164 Majority at 1154 (citing State v. Golladay, 78 Wash.2d 121, 131, 470 P.2d 191 (1970), overruled on other grounds by State v. Arndt, 87 Wash.2d 374, 378, 553 P.2d 1328 (1976); State v. Diebold, 152 Wash. 68, 72, 277 P. 394 (1929)). The majority goes on to conclude that, because the death (likely) occurred first, "the murder [of Dawn Hacheney] was not a probable consequence of the arson [of the Hacheney home]." Id. at 1154, 1160. Thus, the majority holds that "as a matter of law, Hacheney did not murder his wife in the course of arson." Id. at 1154.
¶ 42 The majority's rule stems from an overly narrow interpretation of the statute and of Washington precedent regarding when a murder occurs "in the course of" a felony. Unlike the legislature, the majority would require a direct causal connection between the felony and murder, such that the felony must always commence first. Id. at 1160. Yet, the plain language of the statute, and this court's precedent, indicates RCW 10.95.020(11)'s "in the course of" language is intended to have a broader meaning. I would read the statute accordingly and would uphold the jury's verdict.
¶ 43 In justifying its narrow interpretation of the statutory language at issue, the majority focuses on language from Diebold, heavily relied upon by this court in Golladay, which reads as follows:
"`It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestae of the intended crime, and in consequences thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act.'"
Golladay, 78 Wash.2d at 131, 470 P.2d 191 (quoting Diebold, 152 Wash. at 72, 277 P. 394 (quoting Ruling Case Law 845)). In particular, the majority elevates the final sentence in the above quote to a summary rule for the question presented. Further, the majority would add language to the statute to require that the felony always occur before the murder. Majority at 1160. Yet, the plain language of RCW 10.95.020(11), and this court's precedent, indicates that the majority's rule is unduly narrow.
¶ 44 RCW 10.95.020(11) provides, in relevant part, that "[a] person is guilty of aggravated first degree murder . . . if he or she commits first degree murder . . . and . . . [t]he murder was committed in the course of, in furtherance of, or in immediate flight from" an enumerated felony. (Emphasis added.) A dictionary definition of "course" includes "progress or progression through a series (as of acts or events)." Webster's Third New International Dictionary 522 (2002). Under this commonsense definition, a murder may occur "in the course of" a felony when the commission of the murder overlaps with the progress of the felony. Though such overlap may be unavoidable when the felony commences prior to the murder, it is also possible for such overlap to occur when the murder commences first. So long as the murder may be considered ongoing at the time the felony commences, a jury may find that the murder occurred during the progress of, or "in the course of," the felony. RCW 10.95.020(11).[2] Accordingly, the majority's assertion that the felony must always commence first conflicts with the plain language of RCW 10.95.020(11).
¶ 45 The notion that a murder that commences before a felony may still be found to *1165 have occurred "in the course of" that felony is confirmed by a number of this court's prior decisions. For instance, this court has held that a defendant who kills a person, then takes the victim's property, may be convicted of murder while engaged in the commission of robbery. See, e.g., State v. Craig, 82 Wash.2d 777, 514 P.2d 151 (1973); State v. Coe, 34 Wash.2d 336, 208 P.2d 863 (1949). Likewise, this court has held that a defendant who fatally assaults a person, then rapes the victim, may be convicted of murder while engaged in the commission of rape. See, e.g., State v. White, 60 Wash.2d 551, 374 P.2d 942 (1962), cert. denied, 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963); State v. Whitfield, 129 Wash. 134, 224 P. 559 (1924). Thus, the majority's holding that, to support a conviction under RCW 10.95.020(11), the felony must always commence before the murder is contrary to this court's precedent.[3]
¶ 46 Additionally, the majority can find no support for its unduly narrow interpretation of RCW 10.95.020(11) in this court's most recent decision interpreting that statute. See State v. Brown, 132 Wash.2d 529, 940 P.2d 546 (1997), death sentence rev'd on other grounds sub nom. Brown v. Lambert, 451 F.3d 946 (9th Cir.2006), cert. granted sub nom. Uttecht v. Brown, ___ U.S. ___, 127 S.Ct. 1055, 166 L.Ed.2d 797 (2007). Nowhere in the Brown opinion does it state that the felony must always commence prior to the murder. On the contrary, the Brown opinion contains no reference to a temporal ordering requirement. Instead, the required connection between the murder and felony under RCW 10.95.020(11) is discussed in relatively flexible terms:
To establish that a killing occurred in the course of, in furtherance of, or in immediate flight from a felony, there must be an "intimate connection" between the killing and the felony. The killing must be part of the "res gestae" of the felony, that is, in "close proximity in terms of time and distance." A "causal connection" must clearly be established between the two. In other words, "more than a mere coincidence of time and place is necessary."
132 Wash.2d at 607-08, 940 P.2d 546 (footnotes omitted).
¶ 47 The majority makes much of the Brown court's reference to a "causal connection" between the killing and the felony (while disregarding the court's concluding admonition indicating this phrase simply means "more than a mere coincidence of time and place is necessary."). In particular, the majority focuses on the fact that the Brown court cites to Golladay for the proposition that some "causal connection" is required. Majority at 1158. Yet, the Brown court did not use the "probable consequence" language that the majority now seeks to elevate to the status of rule. Moreover, the Golladay case itself does not appear to support the strict timing requirement that the majority seeks to impose.[4]
¶ 48 By requiring that the murder be the probable consequence of the felony, such that the felony always commence prior to the killing, the majority has adopted an unreasonable interpretation of the statutory language in order to take the issue away from a jury. I would reject such strained construction. Instead, in accordance with the plain language of RCW 10.95.020(11) and this court's precedent, I would interpret the "in the course of" language as follows: A killing may be deemed "within the res gestae or . . . `causal[ly] connect[ed]' to" a felony, Brown, 132 Wash.2d at 610, 940 P.2d 546, when the killing is "done in connection with [the felony], as a part of the same transaction." Craig, 82 Wash.2d at 782, 514 P.2d 151; see also Coe, 34 Wash.2d at 341, 208 P.2d 863 (using phrase "same transaction" to explain proper application of the felony-murder rule); *1166 State v. Millante, 80 Wash.App. 237, 249-50, 908 P.2d 374 (1995) (same), review denied, 129 Wash.2d 1012, 917 P.2d 130 (1996); State v. Temple, 5 Wash.App. 1, 7, 485 P.2d 93 (1971) (same).[5] This standard incorporates a reasonable temporal flexibility missing from the majority's approach and better comports with the plain language of RCW 10.95.020(11), as well as this court's precedent.
¶ 49 Applying the correct standard, I would uphold the jury's verdict in the present case. Considering the evidence in the light most favorable to the State, it is clear that a rational trier of fact could have found the aggravating factor proved beyond a reasonable doubt. See Brown, 132 Wash.2d at 608, 940 P.2d 546 (standard of review for challenges to sufficiency of the evidence).
¶ 50 There was abundant evidence from which the jury could reasonably have found that Hacheney murdered his wife in connection with his arson offense as a part of the same transaction. This evidence includes: (1) Hacheney having made previous plans to be away on a hunting trip with friends on the day of the fire (Christmas day), (2) the presence of propane tanks inside the bedroom where Dawn's body was found, (3) the presence of an electric space heater inside the bedroom where Dawn's body was found, (4) Hacheney's statement to police that he had placed wrapping paper in front of the space heater, (5) the presence of elevated levels of medication in Dawn's blood, (6) Sandra Glass' statements as to Hacheney's confession indicating that he committed the arson immediately after the murder, and (7) the presence of Dawn's body inside the burning house. Based on this evidence, the jury could reasonably have concluded that Hacheney killed his wife in connection with setting fire to his house as part of the same transaction. Thus, the jury's verdict of aggravated first degree murder should stand. Because the majority rejects the jury's verdict without legal justification, I dissent.
MADSEN, J. (dissenting).
¶ 51 Pursuant to RCW 10.95.020(11), a person who commits first degree premeditated murder "in the course of, in furtherance of, or in immediate flight from" certain felonies may be convicted of aggravated first degree murder, which is punishable by death or life without the possibility of parole.[1] The majority and the concurrence/dissent both agree that the quoted language should be interpreted in the same way as similar language in this state's felony murder statutes.[2] I respectfully disagree.

Discussion
¶ 52 The doctrine of felony murder provides that one who causes the death of another person in the commission of a felony is *1167 guilty of murder. While murder statutes generally include as an element some culpable mental state (e.g., RCW 9A.32.030 requiring proof of intent or extreme indifference),[3] which the State must prove, the felony murder rule infers the requisite intent to kill whenever a killing occurs during the commission of a felony.
¶ 53 Under Washington law, to establish a felony murder the State must prove that the killing occurred in the course of, in furtherance of, or in immediate flight from a felony. This "intimate connection" between the killing and the felony is necessary because the felony murder rule transforms the actor's intent to commit the felony into the intent to commit the homicide. See 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.5(a), at 206-07 (1986). Thus, the killing must be part of the "res gestae" of the felony, that is, in "close proximity in terms of time and distance." State v. Leech, 114 Wash.2d 700, 706, 790 P.2d 160 (1990). A "causal connection" must clearly be established between the two. State v. Golladay, 78 Wash.2d 121, 130, 470 P.2d 191 (1970); 2 LaFave & Scott, supra, § 7.5(f)(2), at 225 (discussing "causal connection" necessary between felony and murder in felony murder cases).
¶ 54 As the majority recognizes, when a homicide is followed by a felony, it is often more difficult, if not impossible, for the State to prove the connection necessary to sustain a conviction for felony murder. The prevailing view is that there is no felony murder where the felony was an afterthought. 2 LaFave & Scott, supra, § 7.5(f)(4), at 228. This view is reflected in Golladay. In that case, the defendant claimed he gave the victim and her male companion a ride in his automobile. After dropping them off, he hit an embankment. Witnesses at the accident scene saw him dispose of the victim's purse and shoes. The victim was later found dead. This court reversed Golladay's felony murder conviction because we found no intimate connection between a homicide and a larceny committed after the killing. We determined the larceny was separate, distinct, and independent from the homicide. We concluded there was no "legal relation" between the killing and the larceny, pointing to the fact the larceny occurred after the killing and that the killing was not within the res gestae of the larceny. Golladay, 78 Wash.2d at 130, 470 P.2d 191. Additionally, we observed:
"It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestae of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act."
Id. at 131, 470 P.2d 191 (emphasis added) (quoting State v. Diebold, 152 Wash. 68, 72, 277 P. 394 (1929)). Adopting the italicized language above as the definition of "in the course of, in furtherance of, or in immediate flight from" a felony, the majority reverses Hacheney's aggravated first degree murder conviction because it finds the death here was not a probable consequence of the arson. Majority at 1161.
¶ 55 I agree with the majority's construction as it applies to felony murder because, as noted, in a felony murder prosecution the State is required to prove the mental state for the felony as a substitute for intent to commit murder. In contrast, a crime charged under RCW 10.95.020(11) necessarily *1168 requires proof that a premeditated intentional murder was committed. Thus, the aggravating factor, that "the murder was committed in the course of, in furtherance of, or in immediate flight from" the crime of arson, is not a substitute for the mental element of murder but only serves to enhance punishment for an intentional murder. Thus, there is no reason to import the construction of the first degree felony murder statute into the aggravated first degree murder statute.
¶ 56 Moreover, importing felony murder principles into the aggravated murder statute makes no sense in light of the differences in seriousness of first degree murder and aggravated first degree murder. First degree murder is a class A felony, punishable by life in prison. Aggravated first degree murder is a more serious crime and is punishable by death or life in prison without the possibility of parole. The common thread running through the aggravating factors contained in RCW 10.95.020 is some characteristic of the victim or the defendant, or something in the nature of the killing itself, that makes the murder particularly deserving of mandatory life in prison or death. It is certainly the case that the arson here had an aggravating effect on the completed killing. Mr. Hacheney committed arson in order to cover up his murder. By doing so, he enhanced the chances that his crime would go undetected. Indeed, the death occurred in 1997 and was thought to have been accidental. Hacheney was not charged until 2001, after other events led authorities to question the nature of Hacheney's relationship with his deceased wife. The arson was clearly intended to make the murder investigation more difficult, which it did. Certainly, these circumstances justify a more enhanced punishment than that which is available for first degree murder.
¶ 57 By conflating the elements of felony murder and the aggravating factors of aggravated first degree murder, the majority fails to recognize the different purposes that the language serves, both in the mens rea requirement and the punishment imposed.[4]
¶ 58 As mentioned, the majority is correct that the narrow construction it adopts is necessary in the context of a felony murder to assure that the "transferred intent" theory of felony murder is preserved. However, that narrow definition is not necessary in the penalty context. Instead, the court should give the words "in the course of" their usual meaning, which the majority recognizes means "an `ordered continuing process, succession, sequence, or series.'" Majority at 1160 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 522 (2002)).[5]
¶ 59 Applying that definition, and viewing the evidence in the light most favorable to the State, as we must, the record establishes that this murder was committed in the course of an arson. Hacheney purchased propane canisters prior to the murder. Then, on Christmas, he placed the canisters in the couple's bedroom near an electric space heater. After administering Benadryl to his wife, he suffocated her and then set fire to the bedroom.
¶ 60 I would affirm Mr. Hacheney's conviction for aggravated first degree murder.
WE CONCUR: CHARLES W. JOHNSON, J.
NOTES
[1] Glass also explained that the congregants of Hacheney's church believed that God shared prophecies with various members. Glass testified that in 1992 (well before the events in this case), she had a prophecy that her husband was going to die, but his death never occurred. Then in the fall of 1997, she had a prophecy that Dawn Hacheney would die and that she would become Nicholas Hacheney's wife.
[2] Other trial court conclusions are not in dispute here.
[3] "[Latin `things done'] The events at issue, or other events contemporaneous with them." Black's Law Dictionary 1335 (8th ed.2004) (alteration in original).
[4] Brown admitted that he killed his victim so that he would not leave a witness alive. Brown, 132 Wash.2d at 610, 940 P.2d 546. He also conceded that the murder was committed in the immediate flight from the kidnapping. Id. at 610 n. 234, 940 P.2d 546.
[5] At that time, RCW 9.48.030(3) provided that a killing was murder in the first degree, subjecting the defendant to the possibility of a death sentence, where it was committed "`[w]ithout design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of . . . larceny.'" Golladay, 78 Wash.2d at 128, 470 P.2d 191 (alteration in original) (quoting former RCW 9.48.030(3) (1919), repealed by 1975-76 2d Ex. Sess., ch. 38, § 19). Yet, the Golladay/Diebold test specifically discussed when a killing occurs "in the course of" another crime. Id. at 131, 470 P.2d 191. After Golladay, the legislature adopted the current "in the course of" language. Laws of 1981, ch. 138, § 2(9).
[6] This is not to say that a robber, for example, who kills his victim before committing the taking can necessarily avoid conviction for aggravated first degree murder. A killing to facilitate a robbery would clearly be "in the furtherance of" the robbery. RCW 10.95.020(11). And where the killing itself is the force used to obtain or retain the property, then the death can be said to be the probable consequence of the felony. See State v. Allen, 159 Wash.2d 1, 9, 147 P.3d 581 (2006) (finding considerable circumstantial evidence that murder defendant used force, at least in part, to obtain stolen cashbox).
[7] While Hacheney cites to our comparable state constitutional provision, article I, section 22, in his petition for review, he does not argue that the state constitutional provision might require a different result from the federal analysis in this case. Pet. for Review at 11-12.
[8] Both this court and the United States Supreme Court have drawn a distinction between unavailability for Sixth Amendment confrontation clause purposes and unavailability for purposes of the rules of evidence. Crawford, 541 U.S. at 51, 124 S.Ct. 1354; State v. Price, 158 Wash.2d 630, 639 n. 5, 146 P.3d 1183 (2006). Here, we review only whether Hacheney's right to confrontation was violated. Pet. for Review at 10-12.
[9] Hacheney also seems to argue, for the first time in his supplemental brief, that the redaction of the depositions was erroneous. Pet'r's Suppl. Br. at 2, 7. The depositions were redacted to delete objections and testimony that was ruled inadmissible. CP at 1007-13. Hacheney does not challenge any specific evidentiary ruling, and he does not show that any redacted portion would have been admissible had the witnesses presented live testimony at trial.
[1] I concur in the majority's decision that Hacheney did not suffer a violation of his confrontation clause rights. Majority at 1154.
[2] I would agree with the Supreme Court of Illinois that "the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues throughout the time that the perpetrator conceals the crime and flees the scene." People v. Thomas, 137 Ill.2d 500, 535, 561 N.E.2d 57, 71, 148 Ill.Dec. 751 (1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1092, 112 L.Ed.2d 1196 (1991). This view is implicitly endorsed by this court's prior decisions upholding felony-murder convictions where the killing occurred prior to the felony. See, e.g., State v. Craig, 82 Wash.2d 777, 514 P.2d 151 (1973).
[3] While Craig, Coe, White, and Whitfield are all felony-murder cases which involved slightly different statutory language than is at issue in the present case, the majority correctly notes that such cases are directly relevant to the interpretation of RCW 10.95.020(11)'s "in the course of" language. See majority at 1159.
[4] Contrary to the majority's suggestions, the fact that Golladay's larceny offense occurred later in time than his murder offense was not the key factor in that court's decision. Majority at 1158 (citing Golladay, 78 Wash.2d at 130, 470 P.2d 191). Rather, the crux of the court's rationale was that the larceny was an "entirely separate, distinct, and independent" crime from the murder. Golladay, 78 Wash.2d at 132, 470 P.2d 191.
[5] A similar standard has been endorsed by some of our sister states. For example, the Supreme Court of Illinois, in interpreting its death penalty statute, stated, "[i]t is sufficient that the State proved the elements of the crimes and the accompanying felonies were part of the same criminal episode." Thomas, 148 Ill.Dec. 751, 561 N.E.2d at 71; see also Ex parte Roberts, 735 So.2d 1270, 1278 (Ala.) (requiring arson and killing be part of "continuous chain of events" to trigger statutory aggravating circumstance), cert. denied, 528 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999); Way v. State, 496 So.2d 126, 128 (Fla.1986) (requiring arson and killings be part of "same criminal episode" to trigger statutory aggravating circumstance), death sentence vacated on other grounds sub nom. Way v. Dugger, 568 So.2d 1263 (Fla.1990).
[1] RCW 10.95.020 states:

(11) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes:
(a) Robbery in the first or second degree;
(b) Rape in the first or second degree;
(c) Burglary in the first or second degree or residential burglary;
(d) Kidnapping in the first degree; or
(e) Arson in the first degree;
[2] RCW 9A.32.030 Murder in the first degree. (1) A person is guilty of murder in the first degree when:

. . . .
(c) He or she commits or attempts to commit the crime of either (1) robbery in the first or second degree, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first or second degree, or (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants. . . .
[3] RCW 9A.32.030 Murder in the first degree. (1) A person is guilty of murder in the first degree when:

(a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; or
(b) Under circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person. . . .
(Emphasis added.)
[4] Even if the majority is correct that the language in RCW 9A.32.030(c) and RCW 10.95.020(11) should be interpreted as having the same meaning, the only case analyzing that language in a charge under RCW 10.95.020(11) held that the language should not be applied literally. Instead, the court said that the inquiry is whether the killing was part of the res gestae of the felony. State v. Brown, 132 Wash.2d 529, 610, 940 P.2d 546 (1997).
[5] The majority falls back on the rule of lenity as a reason for its narrow construction of the aggravating factor. However, that concept is not applicable here because the majority agrees that "in the course of" has a plain meaning. Again, the narrow construction is only necessary to preserve the "transferred intent" element that justifies the felony murder rule.